**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**AT NASHVILLE**

| | | |
|---|---|---|
| **KAREN BOYD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:11-0841** |
| | ) | |
| **NASHVILLE LIMO BUS, LLC,** | ) | **JUDGE HAYNES** |
| | ) | **JURY DEMANDED** |
| **Defendant.** | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

COMES NOW the Plaintiff, Karen Boyd, by and through counsel, and submits this Memorandum of Law in Support of her Motion for Partial Summary Judgment, stating and showing unto the Court as follows:

## I. INTRODUCTION

This is a Fair Labor Standards Act ("FLSA") misclassification case. Prior to the initiation of this lawsuit, Nashville Limo Bus, LLC (hereinafter "Defendant") was involved in a similar FLSA case, *Coats v. Nashville Limo Bus, LLC* (Case No. 3:10-cv-00759), which was filed with this Court on August 12, 2010 by David and Tammy Coats. In that case, David and Tammy Coats, among others, were seeking to collect unpaid wages. As former employees of Nashville Limo Bus, LLC, Plaintiffs asserted that Nashville Limo Bus, LLC misclassified Plaintiffs, as well as all other similarly situated drivers, as "independent contractors." Consequently, "Plaintiffs allege[d] that Defendants willfully failed to pay Plaintiffs, as employees, appropriate taxes, wages and overtime. Plaintiffs also aver[red] that Defendants wrongfully discharged Plaintiffs in retaliation for asserting their statutory rights under the FLSA." *Coats v. Nashville Limo Bus, LLC,*

2011 U.S. Dist. LEXIS 8104, at *1-2 (M.D. Tenn. Jan. 27, 2011). Plaintiffs filed a motion for conditional classification under 29 U.S.C. § 216(b), which the Court granted on January 27, 2011.

As a former employee of Defendant, Karen Boyd (hereinafter "Plaintiff") received notice of the Coats' lawsuit as well as a consent form to exercise her option of opting-in to join the class of plaintiffs in the lawsuit against Nashville Limo Bus, LLC.   However, rather than be affected by any judgment or settlement rendered in that case, whether favorable or unfavorable to the class, Plaintiff chose not to join the lawsuit.   It was Plaintiff's preference to retain Gilbert Russell McWherter PLC as legal counsel to represent her in a separately filed, individual lawsuit.

Currently before the Court is Plaintiff's Motion for Partial Summary Judgment on the issue of whether Plaintiff was an independent contractor.   Plaintiff filed this Motion on the basis that there is no genuine issue of material fact that Defendant has misclassified Plaintiff as a "independent contractor."

## II. INDEPENDENT MISCLASSIFICATION CASES GENERALLY

In this case, Plaintiff alleges that she was misclassified as an "independent contractor." This is an increasing problem in the American workforce.   In a commissioned study by the U.S. Department of Labor in 2000, researchers found that 10% to 30% of firms audited in nine states had misclassified employees as independent contractors.   *See U.S. Government Accountability Office Report to Congress,* GAO-09-717 (August 2009).   As far back as 1984, the I.R.S. estimated that "U.S. employers misclassified a total of 3.4 million employees, resulting in a loss of $1.6 billion (in 1984 dollars)."   *Id.*   The misclassification of U.S. workers is a tremendous issue, considering that approximately 10.3 million workers, or 7.4% of the workforce, are classified as independent contractors.   Where these employees are misclassified, it results in a tremendous amount of "wage theft" in the form of unpaid overtime compensation, as well as a significant loss

2

of government tax revenue.

## III. FLSA'S BROAD DEFINITION OF "EMPLOYEE"

In determining whether a plaintiff is an "employee" under the FLSA, the term is not limited to its common law meaning. *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 728, 67 S.Ct. 1473, 91 L.Ed. 1772 (1992). Instead, the term "employee" under the FLSA must be interpreted with "great breadth and generality" in order to accomplish the goals of the law. *Dunlop v. Carriage Carpet Co.*, 548 F.2d 139, 143 (6th Cir. 1977) (citing *United States v. Rosenwasser*, 323 U.S. 360, 363 n. 3 (1945) (the term "employee" has been given "the broadest definition that has ever been included in any one act")).

In interpreting the provisions of the FLSA, courts have construed the terms "liberally to effectuate the broad policies and intentions of Congress." *Dunlop*, 548 F.2d at 144. In *Dunlop*, the Sixth Circuit stated:

> The Fair Labor Standards Act of 1938 was enacted by Congress to be a broadly remedial and humanitarian statute. The Act was designed to correct "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers . . ."
>
> In interpreting [the FLSA] the courts have construed the Act's definitions liberally to effectuate the broad policies and intentions of Congress . . .
>
> . . . "The terms 'independent contractor', 'employee', and 'employer' are not to be construed in their common law senses when used in federal social welfare legislation . . . Rather, their meaning is to be determined in light of the purposes of the legislation in which they were used." In the application of such legislation employees are those who as a matter of economic reality are dependent upon the business to which they render service. (Citations omitted).

548 F.2d 139, 143 (6th Cir. 1977) (citing *United States v. Rosenwasser*, 323 U.S. 360, 363 n. 3, 65 S.Ct. 295, 296, 89 L.Ed. 301 (1945)). In *Imars v. Contractors Mfg. Servs*., the Sixth Circuit stated the following:

> The FLSA defines employment relations very broadly. First, 29 U.S.C. § 203(e)(1)

3

defines employee as "any individual employed by an employer." Next, "employ" is defined as "to suffer or permit to work." 29 U.S.C. § 203(g). This definition was described by then-Senator Hugo Black as "the broadest definition that has ever been included in any one act." See *United States v. Rosenwasser*, 323 U.S. 360, 363 n.3, 89 L. Ed. 301, 65 S. Ct. 295 (1945). The FLSA's definition is broader than the common-law definitions used by other statutory schemes. See *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326, 117 L. Ed. 2d 581, 112 S. Ct. 1344 (1992) (noting that FLSA has broader coverage than ERISA, which relies on traditional agency-law principles to determine employee status); accord *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 965 (6th Cir. 1991) (same) (citing *Goldberg v. Whitaker House Coop.*, 366 U.S. 28, 33, 6 L. Ed. 2d 100, 81 S. Ct. 933 (1961)). Rather, the definition is "to be determined in light of the purposes of the legislation" so that "employees are those who as a matter of economic reality are dependent upon the business to which they render service." *Donovan v. Brandel*, 736 F.2d 1114, 1116 (6th Cir. 1984) (quotation marks omitted) (quoting *Dunlop v. Carriage Carpet Co.*, 548 F.2d 139, 145 (6th Cir. 1977)).

1998 U.S. App. LEXIS 21073, at *7-8 (6th Cir. 1998). In light of this, Plaintiff is easily able to show that she was misclassified as an independent contractor.

## IV. FACTUAL BACKGROUND

Defendant is engaged in the business of employing workers to drive cars to and from various destinations, including car dealerships, automobile wholesalers, and auctions. Workers are transported to and from these locations on a designated van owned by Defendant. The persons who act on Defendant's behalf are not classified by Defendant as "employees." Instead, Defendant classifies these individuals as "independent contractors," thus attempting to avoid the overtime and minimum wage requirements of the FLSA. Moreover, this misclassification allows Defendant to avoid payroll tax obligations. Plaintiff is one of Defendant's former workers who drove cars to and from the abovementioned locations.

## V. STANDARD OF REVIEW

Summary judgment is appropriate when there is "no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). *See Covington v. Knox County School Sys.*, 205 F.3d 912, 914 (6th Cir. 2000). Generally, summary

4

judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Canderm Pharmacal, Ltd., v. Elder Pharm., Inc*., 862 F.2d 597, 601 (6th Cir. 1998) (quoting Fed. R. Civ. P. 56(c)); *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Covington*, 205 F.3d at 914 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).   In addition, the court must view all the facts as well as the reasonable inferences to be drawn from the facts, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002). Moreover, the moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. *See Martin v. Kelley*, 803 F.2d 236, 239 n.4 (6th Cir. 1986).

Mere allegations of a factual dispute are not sufficient to defeat a properly supported motion for summary judgment. *See Anderson*, 477 U.S. at 247-48.   A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.   The substantive law involved in the case will underscore which facts are material and only disputes over outcome-determinative facts will bar a grant of summary judgment. *Id*. at 248. Accordingly, to defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). In order to succeed on a motion for partial summary judgment, the moving party must show that there is an absence of evidence to support a particular issue of the non-moving party's case and that the evidence is "so one-sided that one party must prevail as a

matter of law." *Lexington-South Elkhorn Water Dist. v. City of Wilmore*, 93 F.3d 230, 233 (6th Cir. 1996); *Anderson*, 477 U.S. at 251-52.

When determining whether plaintiffs are properly classified as "employees" or "independent contractors" within the meaning of the FLSA, a court's decision to grant a motion for "summary judgment may be appropriate, because the question of 'whether a particular situation is an employment relationship is a question of law.'" *Imars*, 1998 U.S. App. LEXIS 21073 at *8 (quoting *Fegley v. Higgins*, 19 F.3d 1126, 1132 (6th Cir. 1994)); accord *Donovan v. Brandel*, 736 F.2d 1114, 1116 (6th Cir. 1984). Accordingly, if this Court is able determine whether Plaintiff is an "employee" or "independent contractor" on the basis of the undisputed facts and the necessary inferences arising therefrom, then resolution of this issue is proper at the summary judgment stage.

## VI. PLAINTIFF WAS MISCLASSIFIED

In determining whether a plaintiff is an employee or an independent contractor for purposes of the FLSA, the court should analyze the "economic reality" of the employment relationship. *Rutherford Food Corp*, 331 U.S. at 728. Courts and triers of fact must look to the extent the alleged employee is economically dependent upon the employer. *See, e.g.*, *Bartels v. Birmingham*, 332 U.S. 126 (1947). In *Rutherford*, which is the seminal case in this area of the law, the U.S. Supreme Court set forth six (6) factors, commonly known as the "economic reality" test, for courts to consider in determining whether an individual is truly an employee under the FLSA or an independent contractor. *Imars*, 1998 U.S. App. LEXIS 21073 at *9-10; *Lilley v. BTM Corp.*, 958 F.2d 746, 750 (6th Cir. 1992); accord *Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1535 (7th Cir. 1987); *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2d. Cir. 1988); *Donovan v. DialAmerica Mktg., Inc.*, 757 F.2d 1376, 1383 (3d Cir. 1985). Those factors were codified at 29

6

C.F.R. § 500.20(h)(4):

    (a)            The nature and degree of the putative employer's control as to the manner in which the work is performed;

    (b)            The putative employee's opportunity for profit or loss depending upon his/her managerial skill;

    (c)            The putative employee's investment in equipment or materials required for the task, or the putative employee's employment of other workers;

    (d)            Whether the services rendered by the putative employee require special skill;

    (e)            The degree of permanency and duration of the working relationship;

    (f)            The extent to which the services rendered by the putative employee are an integral part of the putative employer's business.

In *Brandel*, the Sixth Circuit "inverted" the sixth factor to ask whether the workers were economically dependent upon the business for which they were laboring. *Brandel*, 736 F.2d at 1120; *see Imars*, 1998 U.S. App. LEXIS 21073 at *11(characterizing its earlier treatment of the sixth factor in *Brandel* as an inversion). In answering that question, the Sixth Circuit looked to other factors, such as (a) whether the worker was subjected to long hours at low wages; (b) whether similar work was available elsewhere; and (c) whether the alleged employer unilaterally controlled the rate of pay. *Brandel*, 736 F.2d at 1120. "Other circuits have endorsed similar inquiries under the heading of a separate, seventh factor." *Wilson v. Guardian Angel Nursing, Inc*., 2008 U.S. Dist. LEXIS 59623 (M.D. Tenn. July 31, 2008); *see*, e.g., *Lauritzen*, 835 F.2d at 1538; see also, *Usery v. Pilgrim Equip. Co*., 527 F.2d 1308, 1311-12 (5th Cir. 1976); *Donovan*, 757 F.2d at 1385.

    These factors are not exhaustive, and no single factor is determinative. *Chao v. Mid-Atl.*

7

*Installation Serv., Inc.*, 16 Fed. Appx. 104, 107 (4th Cir. 2001) (citing *Lauritzen*, 835 F.2d at 1535). Rather, this balancing test is designed to determine, under the totality of circumstances, whether "the workers depend upon someone else's business for the opportunity to render service or are in business for themselves." *Superior Care*, 840 F.2d at 1059; accord *Lilley*, 958 F.2d at 750; *Brandel*, 736 F.2d at 1116.

In this case, the owner of Defendant, Tracy McMurtry, participated in a Rule 30(b)(6) deposition (Deposition of Tracy D. McMurtry at 6:4-11, Exhibit 1) (attached hereto as Exhibit A). In his deposition, Mr. McMurtry testified about the factors of the "economic reality" test as they relate to Defendant's drivers. As discussed more fully below, Mr. McMurtry's testimony reveals that Plaintiff does not satisfy the factors for classification as an independent contractor. Accordingly, Plaintiff contends that even Mr. McMurtry's own testimony supports her claim that she was an "employee" under the FLSA.

In addition, courts are in agreement that "explicit contractual arrangements" are unpersuasive. *Rutherford Food Corp.*, 331 U.S. at 729 ("[w]here the work done, in its essence, follows the usual path of an employee, putting on an 'independent contractor' label does not take the worker from the protection of the Act"); *Robicheaux v. Radcliff Material, Inc.*, 697 F.2d 662, 667 (5th Cir. 1983) ("[a]n employee is not permitted to waive employee status"). The Sixth Circuit explained that the purpose of overlooking such arrangements is "simple: 'The FLSA is designed to defeat rather than implement contractual arrangements.'" *Imars*, 1998 U.S. App. LEXIS 21073 at *15 (quoting *Lauritzen*, 835 F.2d at 1544-45 (Easterbrook, J., concurring)). In fact, in *Wilson v. Guardian Angel Nursing, Inc.*, a 2008 federal case from the Middle District of Tennessee, Judge Nixon addressed the parties' Independent Contractor agreement and stated that "the terms of the ICA do not control this Court's determination of whether [p]laintiffs were employees or

8

independent contractors." 2008 U.S. Dist. LEXIS 59623 at *41.   Judge Nixon later explained that

the language of the ICA "has no bearing on the Court's analysis for the reason noted above, that

the FLSA is designed to subvert, rather than enforce, the authority of labor contracts." *Id.* at

*49-50.

Here, Plaintiff was required to sign a Driver Agreement which states that, "I understand

that I am a contract labor driver for Nashville Limo and Transport. I understand that I will be paid

as a 1099 worker." (Ex. A at 31:2-13, Ex. 2). However, the Court should heed the advice of the

Sixth Circuit and look past the parties' contractual arrangement.   "Likewise, classifications made

by the Tennessee Employment Security Division" should not influence the Court's decision

because the "ESD distinguishes between 'employees' and 'independent contractors' on the basis

of factors distinct from the economic realities test." *Wilson*, 2008 U.S. Dist. LEXIS 59623 at *34.

### A.  <u>Nature and Degree of Control</u>

Regarding the nature and degree of Defendant's control over the manner in which the work

was performed, Defendant controlled nearly every aspect of Plaintiff's work.   Similarly, in

*Wilson*, the Court determined that the defendants maintained "a high degree of control over LPNs

with whom they contract." 2008 U.S. Dist. LEXIS 59623 at *47.   Judge Nixon pointed out several

considerations: (i) although LPNs are not obligated to accept any shifts, they can only work the

hours that are approved by the defendants; (ii) the defendants control the manner in which LPNs

conduct their duties while in the homes of patients; (iii) the defendants also control the manner in

which LPNs conduct themselves as representatives of the defendants' company. *Id.* at *48.   For

example, the defendants required the LPNs to "comport themselves in the manner which [the

defendants'] deem proper" which meant LPNs were forbidden "from smoking in the homes of

clients." *Id.*at *48-49. The Court acknowledged that "[w]hile many of these rules likely reflect

9

sound judgment, the fact remains that LPNs are not free to exercise discretion on these matters." *Id.* at *49. Not surprisingly, the Court found this factor weighed heavily in favor of a finding of an employment relationship.

Here, Defendant scheduled the appointments for Plaintiff and proactively monitored Plaintiff and the other drivers by paying for the vehicles' fuel and maintenance needs. (Ex. A at 27:13-25; 29:3-10, 19-25; 30:1-20).   Although they are not obligated to accept any work offered to them by Defendant, drivers, including Plaintiff, could only work on the days requested by Defendant.   Specifically, the Driver Agreement includes the following provision: "I understand that Nashville Limo is not under any obligation to call me on a daily basis. Nashville Limo has the right to pick and choose whenever and whomever they want to work." (Ex. A at 31:2-13, Ex. 2). In addition, the Driver Agreement requires drivers to: (i) refrain from smoking in any vehicle in which they are driving or riding; (ii) refrain from exceeding the speed limit; (iii) refrain from using their cell phone while driving; (iv) refrain from eating or drinking in any vehicle they are driving; (v) refrain from turning on the radio, opening the convertible top or sunroof on any vehicle they are driving; and (vi) be courteous to and respect all other drivers for Nashville Limo. (Id.) Accordingly, Defendant maintained a high degree of control over Plaintiff and as such, this factor weighs heavily in favor of a finding of an employment relationship.

> **B.  Employee's Opportunity for Profit or Loss**

The second factor of the "economic reality" test is the employee's opportunity for profit or loss depending upon his/her managerial skill.   This factor heavily weighs in favor of Plaintiff. "The question under the opportunity for profit or loss factor is whether Plaintiffs' earnings were tied to their performance once they accepted work." *Wilson*, 2008 U.S. Dist. LEXIS 59623 at *45. "It is the mark of an independent contractor that a stake in the venture provides both carrot and

stick, such that planning, efficiency and skill are rewarded above and beyond the initial contract." *Id*.

In *Wilson*, the Court stated that whether the plaintiffs had a "stake in the venture" is a significant consideration and because the LPNs were paid on a predetermined rate "without regard to their skill, efficiency, or any other variable relative to performance or other circumstances," the Court properly determined that LPNs had no opportunity for profit or loss. *Id*. at *47. To support the determination that this factor weighs in favor of an employment relationship, Judge Nixon referenced *Brock v. Superior Care, Inc*., 840 F.2d 1054, 1059 (2d Cir. N.Y. 1988), in which the Second Circuit came to the identical conclusion on nearly the same facts. *Id.* at *46.

Here, not only did Defendant's Driver Agreement, mentioned above, lack any meaningful opportunity for negotiation for Plaintiff or any other new driver (Ex. A at 31:2-13, Ex. 2), but Plaintiff also did not have an opportunity for profit or loss. In fact, when asked whether drivers for Defendant get to negotiate the terms of their agreement, Mr. McMurtry testified that the agreement was a "form that all Nashville Limo divers signed." (Ex. A at 31:13-14). Furthermore, Plaintiff was paid a predetermined rate without regard to any other factor pertaining to her performance. Defendant stated that "Plaintiff was paid on a flat per-route basis. The amounts paid per route varied based upon the distance covered by each route. For instance, most intra-city runs were paid a flat rate of $13.00. A run from Nashville, TN to Memphis, TN, on the other hand, paid a flat rate of $70.00." (Defendant's Responses to Plaintiff's First Set of Interrogatories, ¶ 3, Ex. 3 to Ex. A). Thus, "Plaintiff was not paid based on a work week, but rather on a flat per-route basis." (Id. at ¶ 14, Ex. 3 to Ex. A) *See* Ex. A at 38:9-25; 39:1-19; 42:25; 43:1; Ex. 5. Consequently, this second factor of the "economic reality" test weighs heavily in favor of Plaintiff.

11

**C. <u>Employee's Investment in Materials and Equipment</u>**

The third factor for the Court's consideration is the employee's investment in materials and equipment, or the employee's employment of other workers.  The parties are in agreement that Plaintiff did not employ other workers and did not invest any of her own resources in materials or equipment.   In fact, all that Plaintiff was required to have was a valid driver's license and proof of car insurance (Deposition of Karen Boyd at 55:11-16)(attached hereto as Exhibit B).

The defendants in *Wilson* required LPNs to provide their own supply of basic nursing equipment, including a uniform, scissors, stethoscope, thermometer and blood pressure cuff, many of which were provided to LPNs in nursing school, but could be purchased for approximately $45.00.  2008 U.S. Dist. LEXIS 59623 at *44.  Judge Nixon reasoned that since "this case presents a working environment in which neither [p]laintiffs nor [d]efendants expend considerable resources on the tools of [p]laintiffs' trade," this factor of the economic reality test "offers no insight into the nature of the working relationship between the parties" and accordingly, is not assigned any weight. *Id* at *44-45.

Moreover, the Sixth Circuit held that "[t]he capital investment factor is most significant if it reveals that the worker performs a specialized service that requires a tool or application which he has mastered or that the worker is simply using implements of the landowner [alleged employer] to accomplish the task." *Brandel*, 736 F.2d at 1118-19.  Plaintiff did not perform a specialized service that required a tool or application which she has mastered, she did not make any investment in materials and equipment, and she did not employ other workers.   Rather, Defendant paid for Plaintiff's fuel and maintenance needs.  (Ex. A at 27:13-25; 29:3-10, 19-25; 30:1-20). Accordingly, this factor weighs in Plaintiff's favor.

12

**D. Whether Services Rendered By Plaintiff Required Special Skill**

Whether the services rendered by the employee required special skill is the fourth factor of the "economic reality" test. In evaluating Plaintiff's skills under this multi-factor test, this factor also weighs in favor of Plaintiff. Plaintiff drove ordinary vehicles and was not required to have a commercial driver's license. (Ex. B at 55:11-16). In fact, Mr. McMurtry agreed that without her CDL, Plaintiff "would not have driven anything larger than a Suburban." (Ex. A at 48:20-25). Mr. McMurtry clarified that Plaintiff may have driven a box truck, but does not personally know whether Plaintiff ever drove such a vehicle. (Ex. A at 49:1-5). The question under the skills factor is whether the worker's skills are "more like piecework than an enterprise that actually depended for success upon the initiative, judgment or foresight of the typical independent contractor." *Rutherford Food Corp.*, 331 U.S. at 730; *Brandel*, 736 F.2d at 1118 n.7; *Superior Care, Inc.*, 840 F.2d 1060 ("[a] variety of skilled workers who do not exercise significant initiative in locating work opportunities have been held to be employees under the FLSA") (citations omitted).

For example, in *Wilson*, the court stated that it is "essential to ask whether, in the larger picture, LPNs have the skills necessary to locate and manage discrete work projects characteristic of independent contractors, or whether their skills are of the task-specific, specialized kind that form a piece of large enterprise, suggesting employee status." 2008 U.S. Dist. LEXIS 59623 at *42. The Court highlighted the LPNs reliance upon the defendants for job placements as support for the Court's determination that LPNs "skills were of the kind that weigh in favor of a determination of employee status." *Id.* at *43-44. In this case, Plaintiff's skills are of the kind that weighs in favor of a determination of employee status. She merely had to drive an ordinary vehicle from one place to another. (Ex. A at 9:22-25; 10:1-15).

### E.  Permanency and Duration of the Working Relationship

The fifth factor for the Court to consider is the degree of permanency and duration of the working relationship.   Here, Plaintiff was not contracted for a specific period of time.   Instead, she was hired indefinitely and generally worked too many hours for Defendant to be able to engage in meaningful alternative work.   Her total length of employment was approximately eighteen (18) months, beginning on March 3, 2010 and ending on August 18, 2011. (Defendant's Responses to Plaintiff's First Set of Interrogatories, ¶ 11, Ex. 3 to Ex. A).

Moreover, "[u]nder the permanence prong, the duration of the working relationship is not as significant as the number of hours worked and the exclusivity of the working arrangement." *Id.* at *37 (citing *Donovan v. Gillmor*, 535 F. Supp 154, 162-63 (D.C. Ohio 1982) appeal dismissed, 708 F.2d 723 (6th Cir. 1982); *Lauritzen*, 835 F.2d at 1537). Mr. McMurtry testified that Defendant does not have any competitors to speak of (Ex. A at 27:3-4) and Plaintiff claims that the long work hours required by her duties with Defendant excluded the possibility of engaging in meaningful alternative work. (Ex. B at 74:14-16; 125:5-13; 126:20-25; 127:1-2; Ex. A at 15:23-25; 16:1-9). This factor likewise weighs in favor of a determination of employee status.

### F.  Services Rendered Were an Integral Part of Defendant's Business

The sixth and final factor in the multi-factor "economic reality" test is whether the services rendered were an integral part of Defendant's business. This factor easily weighs in favor of Plaintiff.   In *Wilson*, determined that "work performed by [p]laintiffs is at the heart of [d]efendants' business." 2008 U.S. Dist. LEXIS 59623 at *52. To support this determination, the Court stated that, "[u]nder nearly identical circumstances, the Second Circuit found that 'the services rendered by the nurses constituted the most integral part of [defendant's] business, which is to provide health care personnel on request.'" *Id.* (quoting *Superior Care*, 840 F.2d at

14

1059-1060).

According to Mr. McMurtry, Defendant's business was to transport cars from "point A to point B." (Ex. A at 9:22-25; 10:1-15). Plaintiff, as well as other drivers, were responsible for driving those cars. (Ex. A at 10:16-20). Defendant stated that Plaintiff's "typical contractual duties involved driving vehicles back and forth from customer locations to delivery destinations." (Defendant's Responses to Plaintiff's First Set of Interrogatories, ¶ 11, Ex. 3 to Ex. A). Defendant also stated that "100% of Plaintiff's time was spent performing her routes." (Id. at ¶ 12, Ex. 3 to Ex. A). Transporting cars is the very nature of Defendant's business. Consequently, the work performed by Plaintiff is at the very core of Defendant's business. It is without surprise that this factor weighs in favor of an employment relationship.

## VII. DEFENDANT'S SPOLIATION AND FAILURE TO DISCLOSE EVIDENCE

Plaintiff further moves for summary judgment on the ground that Defendant has failed to retain evidence and failed to disclose evidence. At the outset, Plaintiff wishes to make clear that the failure to produce responsive information in this case is clearly the fault of Defendant and not Defendant's counsel.

Plaintiff served interrogatories and requests for production early in this case. Defendant responded with unverified responses. (Exhibit 3 to Ex. A). Plaintiff attempted to obtain a Rule 30(b)(6) Deposition, which had to be rescheduled multiple times. (See Exhibit 1 to Ex. A). At the Rule 30(b)(6) deposition, Tracy McMurtry, the owner of Defendant testified on behalf of the company. (Ex. A at 6:4-11). He reviewed Defendant's written discovery requests. Because this is an FLSA misclassification case, Plaintiff asked the following in an interrogatory and received the following response:

10. Describe in detail all categories or types of records that you have kept that show or indicate hours worked by Plaintiff, including but not limited to time cards, time

15

sheets, and telephone and/or computer log-in records. This includes all records from which hours worked information may be obtained, even if that document or record is used for a purpose other than keeping time. Please include in your answer the position of all employees responsible for keeping such records.

RESPONSE: In lieu of description, responsive documents are attached hereto in response to Plaintiff's Requests for Production of Documents.

(Defendant's Responses to Plaintiff's First Set of Interrogatories, ¶ 10, Ex. 3 to Ex. A).

Mr. McMurtry reviewed the interrogatory responses at the Rule 30(b)(6) deposition and confirmed they were correct. Mr. McMurtry initially agreed that there were no documents which reflected the number of hours worked by Plaintiff. (See Ex. A at 15:13-25; 16:1-6; 17:21-24; 47:18-25; 48:1-8). During the deposition, however, Defendant reversed course and claimed there were logs kept by van drivers that would show the hours Plaintiff worked. (Ex. A at 37:3-10; 45:15-25; 46:1-25; 47:1-2; 48:3-5). However, Defendant failed to disclose these documents when Plaintiff initially requested them. Defendant did eventually disclose what purports to be these documents, though the disclosure came after the Rule 30(b)(6) deposition and after the close of discovery.

Moreover, these van logs are impeached by both Plaintiff's testimony and the testimony of Defendant's Rule 30(b)(6) witness, Mr. McMurtry. Plaintiff claims she worked in excess of 40 hours most weeks. (Ex. B at 74:14-16; 125:5-13; 126:20-25; 127:1-2). Even Defendant's Rule 30(b)(6) witness, Mr. McMurtry, admits that employees work from approximately 9:00 a.m. until 6:00 p.m. most days, including some Saturdays. (Ex. A 15:23-25; 16:1-9). This is inconsistent with the late-disclosed documents.

As if these issues were not enough, on July 26, 2012, after the Rule 30(b)(6) deposition and after the close of discovery, Defendant then sent Plaintiff a settlement offer letter[1] (attached hereto

---

1 Plaintiff acknowledges this communication is for the purposes of settlement and does not attempt to use such

16

as Exhibit C) claiming additional unproduced evidence. Defendant claimed, among other things, that there were video tapes at the Defendant's facility that would have shown the times Plaintiff worked. Specifically, Defendant identifies time-stamped video evidence of the times the van has departed and arrived at Nashville Limo from May of 2012 through July of 2012. Furthermore, Defendant represented that the video surveillance is archived for forty-five (45) days. However, Defendant has failed to produce any video tape evidence to Plaintiff.

Indeed, Defendant says that it did not preserve those tapes. Plaintiff's last day working as a driver for Defendant was August 18, 2011, and she filed this lawsuit on September 6, 2011. (Docket Entry No. 1). Defendant was served on September 6, 2011, just nineteen (19) days after Plaintiff's last day working for Defendant. (Docket Entry No. 1-2). It is problematic that Defendant, having received notice of this action well within 45 days of her last day, failed to preserve such evidence. Not only did Defendant fail to take advantage of this opportunity, but Defendant's decision to keep archived video tapes beginning in May of 2012 is equally perplexing. Respectfully, the time-stamped video evidence of the times the van has departed and arrived at Nashville Limo from May of 2012 through July of 2012, is irrelevant. Defendant was given the opportunity to preserve video evidence which would overlap with the times Plaintiff was an employee, and yet, Defendant failed to preserve such evidence. To date, Plaintiff still has not received any video tapes from Defendant.

In its settlement offer, Defendant also claims it will use witnesses and documents from some of its customers regarding the hours worked by Plaintiff. Specifically, Defendant lists as evidence the testimony and business records from Nashville Auto Auction and various dealerships

communication in violation of Rule 408 of the Federal Rules of Evidence. Rather, Plaintiff seeks to introduce this letter as additional proof that the documents described therein were never disclosed nor provided to Plaintiff despite Plaintiff's efforts to obtain such discovery.

regarding the time vehicles were picked up and arrived. Plaintiff has not been provided with such documentation. Again, the existence of these documents was never disclosed prior to discovery and, as of this writing, they have still not been produced. Accordingly, for all of the above-mentioned reasons, Plaintiff has serious reservations about the authenticity of these documents and no way to explore those concerns because they were disclosed after the discovery deadline passed.

Based on these discovery abuses, Plaintiff moves for summary judgment as a result of this spoliation. In *Adkins v. Wolever*, a prisoner alleged he had been assaulted by a prison guard. 554 F.3d 650, 651-652 (6th Cir. 2009). An inspector at the prison reviewed color Polaroid photographs of the inmate's injuries and video footage of the area where the alleged assault occurred. *Id.* at 652. During discovery, the Defendant was requested to produce photographs and video footage related to the assault, but these items could not be located and were deemed to have been lost or destroyed. *Id.* Because the Defendant produced only black and white copies of the original photographs and did not produce the video footage, the inmate asked the trial court to instruct the jury that it could presume the missing video and color photographic evidence would be favorable to him. *Id.* The *en banc* Sixth Circuit in *Adkins* then proceeded to find and rule as follows:

> As our sister circuits have recognized, a proper spoliation sanction should serve both fairness and punitive functions. Because failures to produce relevant evidence fall "along a continuum of fault-ranging from innocence through the degrees of negligence to intentionality," the severity of a sanction may, depending on the circumstances of the case, correspond to the party's fault. Thus, a district court could impose many different kinds of sanctions for spoliated evidence, including dismissing a case, ***granting summary judgment***, or instructing a jury that it may infer a fact based on lost or destroyed evidence.
>
> Wolever urges us to hold that he should not be subject to spoliation sanctions because he did not control the evidence at issue. And he might be right, if, as he suggests, the preservation of relevant evidence was entirely beyond his control. But

18

the fact-intensive inquiry into a party's degree of fault is for a district court. Thus, we leave to the district court the exercise of its broad discretion to decide if Wolever should be subject to any form of spoliation sanctions despite the fact that he was not the prison records custodian.

*Id.* at 652-653 (emphasis added).

The case at bar is analogous. Defendant failed to disclose the van logs (which Plaintiff suspects are not authentic) until after the close of discovery. As of this writing, Defendant has not produced witnesses, video tapes, and documents it claims will support its position at trial. Moreover, Defendant claims that video tapes would show the number of hours employees work, yet Defendant has failed to preserve any videos that were made in close proximity to the time Plaintiff worked for Defendant. Plaintiff urges the Court that these failings, along with the evidence of independent contractor status listed above, merit summary judgment in favor of Plaintiff.

Strictly in the alternative, even if the court finds summary judgment is not appropriate solely on the ground of spoliation, Plaintiff argues that she is entitled to an adverse inference as a result of Defendant's failure to disclose documents and an order precluding Defendant's use of this evidence at trial.[2] *Adkins*, 554 F.3d.at 652.

The Sixth Circuit has ruled that a plaintiff is entitled to an adverse inference where the defendant withholds documents without justification. *Keck v. Graham Hotel Systems, Inc.*, 566 F.3d 634 (6th Cir. 2009). In *Keck*, the plaintiffs "alleged that the defendant refused to host their wedding reception at its hotel because they are African-American." *Id.* The plaintiffs brought a §1983 claim. The district court granted summary judgment, and the Sixth Circuit reversed.

The Sixth Circuit relied, in part, on the defendant's refusal to disclose requested documents. It apparently did not matter to the Sixth Circuit that the defendant objected to the

---

[2] Plaintiff expects to file a motion *in limine* on this issue prior to trial.

19

discovery requests and the plaintiff did not file a motion to compel, though that is not relevant in the case at bar as Defendant failed make Plaintiff aware of the existence of such requested documents. According to the *Keck* court:

> Although the Hotel does not dispute that it regularly entered into wedding reception contracts with Caucasians, it refused to disclose whether it did so during the operative time period in this case. During discovery, the plaintiffs requested documentation of all Hotel wedding contracts entered into between June 1 and October 31, 2004. The Hotel refused, arguing that producing such materials was "overly burdensome," that that the relief requested was "overbroad."

*Id.* at 640.

The Sixth Circuit held that "[s]uch documents are crucial to the plaintiffs' case. The refusal may lead to an adverse inference about the nature of such evidence." *Id.* (citing *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1345 (Fed.Cir. 2004)(en banc)("[A] party's refusal to . . . produce evidence in civil suits creates a presumption of an intent to withhold damaging information that is material to the litigation."); *Nat'l Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 557 (N.D.Cal. 1987)("Where one party wrongfully denies another the evidence necessary to establish a fact in dispute, the court must draw the strongest allowable inferences in favor of the aggrieved party."); *Cecil Corley Motor Co. v. Gen. Motors Corp.* 380 F.Supp. 819, 859 (M.D.Tenn. 1974)("When a litigant . . . withholds records or documents while litigation is pending . . . the strongest inferences may be drawn against that party which the opposing evidence in the record permits.")).

## VIII. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that summary judgment be granted in her favor as to liability as there is no genuine issue of material fact that Defendant has misclassified Plaintiff as an "independent contractor." In this case, however, Defendant did not object. Defendant simply failed to disclose their existence until after the discovery deadline.

20

Therefore, Plaintiff is entitled to summary judgment based on this conduct.

Respectfully submitted,

GILBERT RUSSELL McWHERTER PLC


s/Michael L. Russell
MICHAEL L. RUSSELL (20268)
1616 Westgate Circle, Suite 228
Brentwood, Tennessee  37027
Telephone: 615-354-1144
Email: mrussell@gilbertfirm.com

CLINTON H. SCOTT (23008)
101 North Highland
Jackson, Tennessee 38301
Telephone: 731-664-1340
Facsimile: 731-664-1540
Email: cscott@gilbertfirm.com

*ATTORNEYS FOR PLAINTIFF*



## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that a true and exact copy of the foregoing has been mailed electronically via the Court's electronic filing system, to all counsel of record this 15th day of August, 2012.



s/Michael L. Russell